**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 13-cv-00689-RM

JERRY ARCHULETA

    Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner,
Social Security Administration,

    Defendant.

---

# ORDER

---

## I.   PROCEDURAL HISTORY

Plaintiff Jerry Archuleta (Plaintiff), applied for Social Security Disability Insurance (DSI) benefits and Supplemental Security Income (SSI) on January 5, 2009, alleging disability beginning November 18, 2008.  (ECF No.13, pp.80-83).  He was last insured on June 30, 2010. (ECF No. 13, p.115).

His claims were initially denied in October, 2009.  (ECF No. 13, pp.18, 36-44).  On March 23, 2010, Plaintiff filed a timely request for an administrative hearing.  (ECF No.13, pp.18, 45).  He was granted a hearing before an administrative law judge (ALJ), on November 10, 2011, where he appeared, testified, had witnesses testify and was represented by an attorney. (ECF No.13, pp.515-580).  The Administrative Law Judge (ALJ) denied Plaintiff's application for benefits on November 30, 2011.  (ECF No.13, pp.18-29).  This denial became the Commissioner of Social Security's (Commissioner) final decision on January 23, 2013, when after considering Plaintiff's supplemental material, the Appeals Council denied Plaintiff's appeal

of the ALJ's decision. (ECF 13, pp. 7-10). Plaintiff now seeks review of that final decision. (ECF No.1).

## II  FACTUAL HISTORY

### A. Social History

Plaintiff was born on November 1, 1962. (ECF No. 13, p.114). He was 46 years old on November 18, 2008, his alleged disability onset date. (ECF No. 13, p.114).

Plaintiff completed 11th grade of high school in 1980 and has not attended any special classes or attained any special job training, trade, or vocational school. (ECF 13, p.124). His reported work history over the past 15 years includes work as a farm laborer and maintenance worker at a metal products factory. (ECF No.13, pp.121-22, 563).

The record is unclear with regard to Plaintiff's marital status. In his initial application for DSI, Plaintiff reported that he was married in 1988 (ECF No. 13, p.81), however, his hearing testimony indicates that he currently lives with his mother (ECF No.13, p.523). His mother contradicted this in her testimony stating that he lived with her "sometimes." (ECF No. 13, pp. 523, 554, 558). It appears that he does not have his own housing and relies on girlfriend(s) or his mother for housing. *Id.*

### B. Relevant Medical History

On November 18, 2008, Plaintiff was admitted to hospital with acute fractures of his tibial plateau in his right knee subsequent to an altercation with police. (ECF No. 13, p.235). At the time of admission Plaintiff was acutely intoxicated with a blood alcohol level of .304. *Id.* He was discharged after surgical repair of his fractures, on December 8, 2008 with instructions to follow up at his local clinic and to have a return appointment with his surgeon on December 15, 2008. (ECF No. 13, pp. 234-36). At discharge Dr. Kitchen considered Plaintiff "ambulatory

2

with walker (non-weight-bearing right lower extremity), capable of self-care and activities of daily living . . . ." (ECF No. 13, p. 236). His mother had received instructions for his dressing changes. (ECF No. 13, p.234). Plaintiff received various discharge medications including Percocet for pain and a prescription for further post-discharge range of movement physical therapy. (ECF No.13, p.234).

In April, 2009, Dr. Campbell evaluated Plaintiff regarding the functional impacts of his medical conditions. (ECF No. 13, pp.374-78). Her summary noted that Plaintiff was seen for chronic right leg pain at the Sierra Blanca Medical Center on February 12, 2009. (ECF No.13, p.375). At that time his skin graft was not well healed, he was attending physical therapy and requested pain medication. *Id.* He was given a short-term prescription for Percocet and advised to establish with a clinic in Monte Vista to set up a long-term medication regime. *Id.* He was next seen at the Rio Grande Medical Center on February 26, 2009 requesting Percocet and was shifted to Ultram for pain. *Id.*

At Dr. Campbell's consultation, Plaintiff reported that he was a "working alcoholic" and currently used alcohol to augment his prescribed pain medications. (ECF NO. 13, p.374). After a thorough examination, Dr. Campbell diagnosed Plaintiff with *inter alia,* a marked deformity and probably unstable right knee and opined that he could not use stairs without support, should limit bending, limit standing and walking to less than two hours a day, and could not kneel, squat or stoop effectively. (ECF No.13, p.377). She further opined that he was not completely independent in activities of daily living, needing assistance with accessing a bathtub and could not stand long enough to prepare full meals or do household chores. *Id.*

The following month, on May 22, 2009, Plaintiff was referred by the Department of Disability Determination Services, to Immaculate Wesley Psy.D., for a psychological evaluation

with diagnosis and GAF score. (ECF No. 13, p.382). Dr. Wesley found Plaintiff had poor judgment, poor to fair insight, fair abstraction ability and estimated his IQ to be "at best" in the average range. *Id.* She diagnosed Plaintiff with: chronic and severe alcohol dependency; pain disorder associated with both psychological factors and a general medical condition; and an adjustment disorder with mixed anxiety and depressed mood. (ECF No.13, pp.382-83). She assessed his GAF score at 55, and opined that without physical and psychological therapy and medication, he was at risk for "fall[ing] deeper into alcohol use." (ECF No. 13, p.383). She concluded that if clean and sober he might do well with some re-training but otherwise, without help, his prognosis was extremely poor. *Id.*

On June 1, 2009, Plaintiff failed to keep his scheduled appointment with his surgeon, Dr. Kitchen. (ECF No.13, p.405). On July 9, 2009, Plaintiff presented at Rio Grande Hospital Clinic (RGHC) requesting a refill of his Percocet. ECF.No.13, p.465). He was seen by Physician's Assistant Bilak who evaluated Plaintiff, noting that he was currently incarcerated, hypertensive and gave him antihypertensive medication to lower his blood pressure. *Id.* On July 24, 2009, Plaintiff presented at RGHC requesting pain medication. (ECF No. 13, p.464). Dr. Howard prescribed 60 OxyContin and refilled Plaintiff's prescription for Nexium (for indigestion). *Id.*

Dr. Kitchen saw and examined Plaintiff on August 11, 2009, when he also X-rayed Plaintiff's right tibia, fibula and knee. (ECF NO. 13, p.406). He noted Plaintiff had been "lost to follow-up in April 2009", that Plaintiff used a cane from time to time and some Percocet although it was unclear where he obtained the Percocet. (ECF No.13, p.403). Dr. Kitchen noted that Plaintiff had "essentially normal motor function below the knee other than his great toe." *Id.*

Dr. Kitchen diagnosed Plaintiff with a significant mal-union and inward turning deformity of his right tibia which he opined was a result of Plaintiff's substantial noncompliance with his recommended postoperative regimen by weight bearing and failing to follow his prescribed physical therapy regime. (ECF No.13, pp.403-04). Because of Plaintiff's poor compliance to date, Dr. Kitchen did not recommend surgical repair of his deformity but instead fitted Plaintiff with a double upright-hinged brace[1] to help with stability during his normal activities. *Id.* That same day Plaintiff (who was apparently still incarcerated), was seen by Dr. Helgeson at RGHC for follow-up on his chronic leg pain and was given a refill of his OxyContin and a prescription for Percocet. (ECF No. 13, p.463).

Approximately two weeks later, on August 28, 2009, Dr. Howard at RGHC saw plaintiff who was requesting pain medication. (ECF No.13, p.462). His prescriptions for OxyContin, Percocet and Nexium were refilled. *Id.* He next presented at the RGHC on September 10, 2009 where by Dr. Helgeson evaluated him, increased his OxyContin dosage and gave him a one-month supply of both OxyContin and Percocet. (ECF No. 13, p.461).

Dr. Helgeson next saw Plaintiff on October 5, 2009, again increased his OxyContin dosage, and provided prescriptions for OxyContin and Percocet for any break-through pain and for follow-up in one month. (ECF No. 13, p.460). She re-evaluated Plaintiff at RGHC on October 30, 2009, when she continued his pain medication and noted that she believed his hypertension was related to the pain he gets when ambulating. (ECF No.13, p.459). On December 14, 2009, Dr. Helgeson referred Plaintiff to Dr. Kitchen for re-evaluation because of his lack of improvement in pain and refilled his Nexium, OxyContin and Percocet. (ECF No. 13, p.455-58).

---

[1] There is no reference in the record of Plaintiff ever using this knee brace.

On January 26, 2010, Dr. Kitchen re-evaluated Plaintiff noting that Plaintiff had been extremely noncompliant with post-operative instructions which had resulted in a significant mal-union of his tibia, unchanged since his last evaluation four months ago in August 2009. (ECF NO. 13, p.418). Dr. Kitchen further noted that since he had last seen Plaintiff, Plaintiff had developed some early traumatic arthritis in his knee. *Id.* Dr. Kitchen recommended that Plaintiff seek a second opinion regarding a surgical intervention to correct his tibial malformation. *Id.*

There is a gap in Plaintiff's medical records from January 2010 until October 2010 when Dr. Helgeson's notes indicate that Plaintiff's chronic pain had been managed by Dr. McMillan who had been "working with vocational rehab." (ECF No.13, p.454). Dr. Helgeson then resumed managing Plaintiff's chronic pain with monthly evaluations and refills of his pain medications. (ECF No.13, pp. 440-454).

On March 14, 2011, Dr. Helgeson completed a Residual Functional Capacity Questionnaire in which she opined that Plaintiff could: remain seated at a desk without needing to elevate his legs; stand and walk for 15 minutes at a time for a total of one hour in an eight-hour work day; would need rest breaks in bed or an easy chair every two hours during an eight-hour work day; walk with assistance of a cane but was unable to walk one block on uneven ground; use public transportation; carry out routine activities such as shopping and banking; climb a few steps with use of a single handrail; lift and carry one to ten pounds frequently, 11-20 pounds occasionally but never 21-50 pounds; work on a sustained basis except that pain interfered with his ability to complete a workday; and he would likely be absent from work more than four days per month. (ECF No.13, pp.468-75).

On April 30, 2011, Dr. Boatright saw and evaluated Plaintiff. (ECF No. 13, pp.484-87). After examination, Dr. Boatright concluded that plaintiff could sit and stand for six to eight

hours; walk for two to four hours; was limited in areas requiring balance or with unprotected heights; should engage in no squatting or crawling; had no manipulative limitations and should be able to carry 10 pounds continuously, 15 pounds frequently and up to 20 pounds occasionally. (ECF No.13, p.487).

Dr. Shuck, an orthopedic surgeon, saw, examined and x-rayed Plaintiff on May 31, 2011, noted that his right knee had moderate joint effusion, 100 degrees flexion and was diffusely tender and noted that the x-ray showed "pronounced degenerative changes." (ECF NO.13, p.495). Dr. Schuck recommended a corticosteroid injection to ease the pain in Plaintiff's right knee and suspected that he would need a knee replacement in a year or two. (ECF No. 13, p.497). Three days later on June 2, 2011, Plaintiff saw Dr. Helgeson for refills of his pain medication and reported that the injection had caused increased pain. (ECF No.13, p.432). On November 14, 2011[2], Dr. Schuck performed a total knee replacement from which Plaintiff had an uneventful recovery and good result. (ECF No. 13, p.510).

Approximately three months after the ALJ's decision was rendered, on March 4, 2012, Plaintiff fell and fractured his right femur above the knee[3]. (ECF No.13, pp. 502-05). Dr. Schuck performed a surgical fixation of the break and opined that Plaintiff would require a walker or crutches for at least two months. (ECF No.16, pp. 224VV-224HHH).

    C.    **ALJ's Decision:**

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 18, 2008, his alleged onset date. (ECF No.13, p.20). She found that Plaintiff had a severe impairment, right tibial fracture, status post failed open reduction and internal fixation and

---

[2] The ALJ's opinion is dated November 30, 2011. (ECF No. 13, p.29).
[3] The Appeals Council noted that the supplemental material "is about a later date. Therefore it does not affect the decision about whether you were disabled beginning on or before November 30, 2011. If you want us to consider whether you are disabled after November 30, 2011, you need to apply again." (ECF No. 13, p.8).

7

a non-severe impairment of arthritis in his left wrist and hand. *Id.* The ALJ stated that Plaintiff's claim of arthritis was non-severe because it was neither supported by medical diagnosis nor treated since his alleged onset date. *Id.*

She found Plaintiff's mental impairment of adjustment disorder did not cause more than minimal limitation in Plaintiff's ability to perform basic work activities and was thus also non-severe. (ECF No. 13, p.21). She further noted after considerable discussion, that she gave little weight to Plaintiff's GAF score of 55 (indicative of moderate symptoms), because it appeared inconsistent with the mental status exam findings she detailed. (ECF No. 13, pp.21-22).

The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment and retained the residual functional capacity (RFC) to perform light work with the following exclusions: can only lift and carry at the sedentary level of exertion; stand and/or walk for two out of eight hours; is to have no exposure to unprotected heights; cannot climb ropes, ladders and scaffolds; can only occasionally kneel, crawl and walk on uneven surfaces and must use a single point cane as needed. (ECF No. 13, pp.23-27).

The ALJ opined that Plaintiff was unable to perform any past relevant work, was a younger individual with limited education, able to communicate in English and could perform the requirements of representative occupations such as call out operator, information clerk and order clerk. (ECF No. 13, pp.27-28). The ALJ therefore opined that Plaintiff had not been under a disability as defined by the Social Security Act from November 18, 2008 to November 30, 2011, the date of her decision. (ECF No. 13, pp. 28-29).

### III     APPLICABLE LAW and STANDARD OF REVIEW

An individual seeking disability benefits bears the burden of proving a disability. 42 U.S.C. § 423(d)(5). The Act defines "disabled" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §423(d)(1)(A).

To meet this burden, a plaintiff must provide medical evidence of both, an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and of the severity of that impairment during the time of his/her alleged disability. 42 U.S.C. § 423(d)(3); 20 C.F.R. §§404.1512(b) and 416.912(b). A plaintiff is disabled only if his/her impairments are of such severity that s/he is not only unable to do his/her previous work but cannot, considering his/her age, education, and work experience, engage in any other kind of substantial gainful work in the national economy. 42 U.S.C. §423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§404.1520; 416.920; *Williams v. Bowen,* 844 F.2d 748, 750-51 (10th Cir. 1988). Step One is whether the claimant is presently engaged in substantial gainful activity. If s/he is, disability benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that his/her medical impairments would have more than a minimal effect on his/her ability to do basic work activities, s/he is not eligible for disability benefits.

Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, s/he is not presumed to be conclusively disabled. Step Four then requires the claimant to show that his/her impairment(s) and assessed residual functional capacity (RFC) prevent him/her from performing work that s/he has performed in the past. If the claimant is able to perform his/her previous work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).

Finally, if the claimant establishes a *prima facie* case of disability based on the four steps above, the analysis proceeds to Step Five where the Commissioner has the burden of proving that the claimant has the RFC to perform other work in the national economy in view of his/her age, education and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g).

In reviewing a decision of the Commissioner, the court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. *Grogan v. Barnhart,* 399 F.3d 1257, 1261-62 (10th Cir. 2005). Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Castellano v. Sec of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir.1994). The court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner even if the court might have reached a different conclusion. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir. 1994).

## IV   DISCUSSION

Plaintiff seeks review arguing that: (1) the denial is flawed in part because the ALJ failed to utilize a medical expert at the hearing to address whether Plaintiff's condition met a listing; (2) the ALJ erred in refusing to allow Plaintiff's counsel to cross-examine Dr. Boatright; (3) the

vocational findings of both the vocational expert (VE) and the ALJ were contrary to DOT definitions; (4) the VE's testimony as to the number of jobs available lacked substantial evidence; (5) the ALJ erred in failing to give the treating physician's opinion greater weight; (6) the ALJ's credibility findings are not supported by substantial evidence; (7) the RFC, as it pertains to Plaintiff's psychological limitations is not supported by substantial evidence and (8) the new evidence requires a remand for further consideration. (ECF No. 17).

Defendant responds that: (1) the ALJ reasonably considered Plaintiff's alleged mental limitations in determining his RFC; (2) the ALJ reasonably found that Plaintiff's impairments did not meet or medically equal an impairment (3) the ALJ's RFC determination was reasonable based on her findings of Plaintiff's credibility and consideration of the various medical opinions including those of Dr. Helgeson and Dr. Boatright; (4) the ALJ reasonably relied on the VE's testimony regarding jobs Plaintiff could perform and (5) the new evidence does not upset the ALJ's decision. (ECF No. 18).

### A. The ALJ did not commit reversible error in her determination that Plaintiff's condition did not equal a listing.

Plaintiff claims that the ALJ erred in her determination that Plaintiff's condition did not meet or equal a listing. The claim is made only summarily and focuses on the absence of a medical source finding or opinion as to the lack of listing equivalency.

For cases before an ALJ, "the responsibility for deciding medical equivalence rests with the administrative law judge . . . ." 20 C.F.R. §404.1526(e). In making an equivalence determination, the agency considers "all evidence in [the] case record about [an] impairment and its effect on you that is relevant to this finding." 20 C.F.R. §404.1526(c). Normally this includes "the opinion given by one or more medical . . . consultants designated by the Commissioner." *Id.* <u>See also</u> SSR 96-6 (". . . longstanding policy requires that the judgment of a

physician . . . designated by the Commissioner on the issue of equivalence . . . must be received into the record as expert opinion and given appropriate weight.").

In this case there was no opinion as to the listing determination by a medical consultant.[4] Nonetheless, there is no showing that the deficiency constitutes harmful error. The ALJ considered Listing 1.02 (major dysfunction of a joint) as well as Listings 1.03 (reconstructive surgery or surgical arthrodesis of a major weight bearing joint) and 1.06 (fracture of the femur, tibia, pelvis, or one or more of tarsal bones), despite the fact that only Listing 1.03 was suggested by Plaintiff at the hearing. (ECF No.13, p.519). And the ALJ based her decision on medical evidence which supported her determination that Plaintiff lacked an "inability to ambulate effectively." (ECF No. 13, p.23; 20 C.F.R. pt 404, subpt P, app. 1, §1.03).

An "inability to ambulate effectively" is required to meet each of the considered listings and is described in 1.00B2b(2) as follows:

> "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation."

In this case, there was substantial medical evidence that Plaintiff could ambulate effectively. Dr. Helgeson, Plaintiff's treating physician, opined that plaintiff needed to use a cane only in his right hand, not both hands. (ECF No. 13, p.472). Dr. Helgeson also noted the absence of any limitation on the ability to travel without companion assistance to and from a place of work, the presence of an ability to use standard public transportation including the

---

[4] The government explains in its brief that this was because of the case proceeding under a pilot program which allowed non-physicians to complete forms and make determinations at the initial stages. (ECF No.18, p.13).

ability to get up the steps or stand on the bus or other transportation (*Id.* at 473), the presence of an ability to carry out routine ambulatory activities such as shopping and banking and the ability to climb a few steps at a reasonable pace with the use of a single hand rail[5]. *Id.*

When Plaintiff was initially discharged from hospital, he was considered "capable of self-care and activities of daily living." (ECF No. 13, p.236). Orthopedic surgeon Dr. Schuck noted that Plaintiff "ambulates with a cane although he is able to ambulate without it." (ECF No. 13, p.494). Orthopedic surgeon Dr. Kitchen observed that Plaintiff had "essentially normal motor functions below the knee other than his great toe." (ECF No. 13, p.403). Dr. Boatright opined that Plaintiff could "walk for approximately two to four hours . . . ." (ECF No. 13, p.487). And Plaintiff testified before the ALJ that he could walk "at least a block with the cane." (ECF No.13, p.524).

Given the medical record, and the absence of any argument beyond the technical deficiency made in Plaintiff's opening brief (ECF No. 17, pp16-17), I find that there was substantial medical evidence supporting the ALJ's listing determinations and the technical error was harmless.

      **B.**      **The ALJ did not err in not calling Dr. Boatright to appear at the hearing to enable further development of the record and cross-examination by Plaintiff or in discounting Dr. Helgeson's RFC determination.**

Plaintiff contends that the ALJ erred in failing to subpoena Dr. Boatright to appear for cross-examination by Plaintiff, despite Plaintiff's letter request. (ECF No.17, pp.24-28). However, it is well established that a DSI/SSI hearing before an ALJ is a non-adversarial proceeding. *Casias v. Sec. of Health & Human Servs.,* 933 F.2d 799, 801( 10th Cir. 1991). Due process does require that the hearing be complete and fair which means that the ALJ has a basic

---

[5] Despite this Dr. Helgeson concluded that Plaintiff had a limited residual functional capacity – an opinion which the ALJ discounted. (ECF No. 13, pp.26-27).

duty of inquiry to ascertain facts relevant to his/her decision and to learn the claimant's version of those facts. *Id.* The fairness requirement does not require cross-examination of medical report authors in order to be a full and fair hearing. *Id.* (citing *Richardson v. Perales,* 402 U.S. 389, 401-02 (1971)).

Plaintiff's complaints are in essence, that Dr. Boatright's examination was unreasonably brief, involved an area outside his expertise and contradicted Plaintiff's treating physician's conclusions. (ECF Nos. 13, pp. 167-69, 174-78 and 17, pp.24-28). I note that the ALJ detailed Plaintiff's objections to Dr. Boatright's opinion. (ECF NO.13, p.26). She then explained that her RFC determination differed significantly from that of Dr. Boatright in "several respects and is based on the record as a whole, not on a single physician's opinion." *Id.* In fact, the ALJ's RFC is more restrictive that Dr. Boatright's. (Compare ECF No.13, p.23 with ECF No.13, p.487).

Additionally, the record demonstrates that Plaintiff had ample time and opportunity to present medical evidence to rebut Dr. Boatright's report which Plaintiff received well before the hearing. As noted in detail above, the ALJ heard Plaintiff's and his mother's testimony as well as Plaintiff's attorney's arguments regarding Plaintiff's request for subpoena, at the hearing. The ALJ thoroughly reviewed and discussed Dr. Boatright's findings, Plaintiff's objections to that opinion and discussed other relevant medical reports including those of orthopedic specialists. *Id.* The ALJ also conducted the required analysis of Plaintiff's alleged pain and limitations.

I find nothing in the record that leads me to believe that issuing a subpoena to Dr. Boatright or obtaining more medical expert opinions would have added anything of value to the proceedings. Under the circumstances Plaintiff was not deprived of due process. The ALJ's refusal to subpoena Dr. Boatright did not constitute an abuse of her discretion.

As for Dr. Helgeson's RFC determination, an ALJ is required to give the opinion of a treating physician controlling weight only when it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques;" and (2) "consistent with other substantial evidence in the record. *Watkins v. Barnhart,* 350 F.3d 1297, 1300 (10th Cir. 2003), see also 20 C.F.R. §416.927(d)(2). The ALJ in this instance, discussed Dr. Helgeson's findings and treatment, and found that Dr. Helgeson's opinion of Plaintiff's RFC "is not consistent with the record as a whole"; "is not clearly explained or persuasively reasoned" and therefore, gave it little weight. (ECF No. 13, pp.23-27). Reducing the weight of an opinion on these bases is not error.

### C. The ALJ's consideration of Plaintiff's mental health issues and credibility was proper.

The ALJ noted that she considered Plaintiff's GAF score of 55 given by Dr. Wesley. (ECF No. 13, pp.21-22, 379-83). The ALJ stated she gave little weight to that GAF score because Plaintiff had not sought any treatment for a mental impairment and both the record and Drs. Glasco and Raclaw's findings did not support a conclusion of this level of severe mental impairment. (ECF No.13, pp.21-22). She concluded that, based on the record, Plaintiff's GAF score was not representative of his long-term functioning and assigned no limitations in this area of functioning. (ECF No. 13, p.22).

All in all, the claims of deficiency in the ALJ's consideration of Plaintiff's purported mental health issues largely revolve around the failure to account for limitations in plaintiff's concentration, persistence and pace in developing Plaintiff's RFC. And the "limitation" is tethered to the following statement in the ALJ's opinion:

> "The claimant has a moderate impairment in concentration, persistence and pace. The claimant was able to perform simple calculations and could recite 5 digits forward and in

15

> reverse. In his function report, he describes himself as being able to follow instructions very well. Exh.5E, p.6. Therefore, there is [sic] no limitations in the area of functioning."

(ECF No. 13, p.22).

It is apparent to the Court that the ALJ's reference to a "moderate impairment" is a scrivener's error. The ALJ concluded that there were "no limitations" in this area of functioning. The remainder of the discussion of Plaintiff's mental issues is consistent and makes this clear. The ALJ found no mental contribution to limitations of daily living activities. She found based on plaintiff's function report that, he got along with authority figures and had no problems with friends, neighbors and family. She noted no episodes of decompensation, and then concluded that:

> "Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, it is nonsevere . . . ."

(ECF No. 13, p.22).

While far from a demonstration of precise draftsmanship, and apparently the product of an over reliance on templates, the ALJ's finding on the issue of concentration, persistence and pace is that Plaintiff had no limitations in this area. And the finding was supported by substantial evidence.

Plaintiff neither sought nor received treatment for mental health issues. Dr. Helgeson classified his capacity for various mental tasks – including following complex instructions and maintaining attention – as "unlimited." (ECF no. 13, p.474). She downgraded his ability to perform at a persistent pace to "fair", but only due to complaints of pain. *Id.* Dr. Campbell noted that there was "no apparent cognitive deficit." (ECF No. 13, p.377).

Properly construed, the ALJ's decision was that Plaintiff had no limitations due to mental impairment. Thus there was no error in failing to include such limitations in the ALJ's RFC determination.

The ALJ also enunciated clear reasons based on evidence in the record, for finding Plaintiff not credible in his description of his level of debilitating pain and allegations of near inability to perform tasks such as lifting and carrying up to 20 pounds, being able to stand and/or walk for two out of eight hours. *Id.* (ECF No.13, pp.24-27). She detailed these as, e.g., his documented extremity strength post-recovery; his stable pain management as documented in his treatment record, his lack of compliance with physical therapy and doctor's orders regarding weight bearing; the lack of alternate treatment modalities; his trip to Arizona and his inconsistent reports to various providers regarding his limitations resulting from his original injury. *Id.*

Similarly the ALJ detailed her reasons for giving Plaintiff's mother's testimony little weight which included: that she is Plaintiff's mother so expected to be sympathetic; her lack of training to assess the severity of Plaintiff's alleged limitations; her financial incentive to accept his limitations as alleged and that her observations are not consistent with the record as a whole. (ECF No. 13, pp.25-26).

I therefore find that the ALJ's credibility findings are based on substantial evidence in the record. *Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir 1990)(Credibility determinations are the province of the finder of fact, and will not be upset when supported by substantial evidence).

### D. ALJ's reliance on Vocational Expert's testimony was proper.

Plaintiff argues that the vocational expert (VE) was not qualified to give opinions regarding the number of jobs available. Plaintiff contends that any vocational expert (VE) would

require either extra training in statistical analysis or, would have to have done their own local market studies in order to be qualified to testify reliably about the number of jobs available in a national or local economy. (ECF No.13, pp.562-63).

Defendant contends that the ALJ properly relied on the VE's testimony regarding plaintiff's employability. (ECF No. 18, pp.23-26). Specifically Defendant argues that: (1) a one-time finding of poor judgment does not preclude Plaintiff from performing work requiring a reasoning level of three or four; (2) that the ALJ reasonably relied on the VE finding that Plaintiff's completion of tenth grade would allow him to meet the language level requirements of levels three or four; (3) that the discrepancy between the VE's testimony regarding the call-out position and the DOT description of that position was explained by the VE and (4) that the VE's testimony regarding the availability of jobs in the national economy was reasonable. *Id.*

Plaintiff's representative appears to object generally to testimony from any VE who is not also an economist with extra training in statistical interpretation or who has done their own labor market studies. (ECF No.13, p.563). The ALJ in this instance ascertained this VE's qualifications as represented in his curriculum vitae. *Id.* Further, the ALJ asked sufficient questions regarding hypothetical individuals with various representative abilities of the VE to support her opinion. (ECF No.13, pp.563- 66). She also allowed the Plaintiff's representative to extensively question the VE regarding specific physical and scholastic limitations. (ECF No. 13, pp.566-79). The ALJ concluded by asking the VE whether his testimony was consistent with the DOT except as otherwise noted. (ECF No. 13, p.579). The VE testified that it was and that he based his opinion *inter alia,* on his work as "a voc rehab counselor for over 30 years in which I've met and counseled with thousands of adult disabled workers." *Id.* I find the ALJ's reliance on the VE's testimony was reasonable and based on substantial evidence in the record.

Finally, in this instance while it may be that Plaintiff's most recent injury has increased his impairments to a level consistent with a finding of disability, that is a matter for another case. In the instant matter, when the record is viewed as a whole, I find that there is substantial evidence to support the ALJ's ultimate conclusion and consequently find that the ALJ's determinations are supported by substantial evidence and free of legal error.

While Plaintiff argues essentially, that the ALJ should have weighed the evidence differently, this court is not at liberty to re-weigh the evidence but is limited to determining whether the correct legal standards were applied and the decision is supported by substantial evidence in the record.  After a complete review of the record, I find the ALJ's findings are supported by substantial evidence in the record, are free of harmful error and supported by the correct legal standards.

## IV   CONCLUSION

For the reasons detailed above, the Commissioner's January 23, 2013, final decision is AFFIRMED.

IT IS SO ORDERED

DATED this 5th day of January, 2016.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge